## H. APPLE & Co. et al. *v.* L. J. GANONG et al.

1. JUDGMENT OF CHANCELLOR UPON THE EVIDENCE. — The judgment of a chancellor upon controverted facts is, according to the tenor of decided cases, analogous to the verdict of a jury, and like such verdict, will not be disturbed unless opposed to the preponderance of evidence.

2. MARRIED WOMEN'S RIGHTS OF SEPARATE PROPERTY. — Under the married woman's acts of 1839, 1846 and 1857, in force prior to the code of 1871, the husband owned the proceeds of the wife's labor; and real estate purchased in part with her earnings is subject to be taken to that extent in settlement of his debts.

APPEAL from the chancery court of Coahoma county. TRIMBLE, Chancellor.

Louisa Ganong, wife of L. J. Ganong, filed a bill in the chancery court of Coahoma county, in which is charged the following grounds of relief against H. Apple & Co., H. P. Reid, usee, etc., defendants:

That on the 4th of October, 1868, in the circuit court of Coahoma county, H. P. Reed, usee, of Garner, administrater of the estate of Wesse, deceased, obtained judgment for $1,645.40 against L. M. Ganong; and on the 24th of February, following, Apple & Co. obtained judgment against Ganong for $264.94. Executions were issued under these judgments and were levied on certain real estate, which she alleges belonged to her as her own separate estate, and is not liable to be taken in satisfaction of her husband's debts. That she purchased the property with her own money on the 28th of January, 1867, taking a deed of conveyance therefor in her own name. This deed is made an exhibit to the bill. She states that her husband has no interest in said lands; that they are not liable for his debts, and that a

sale under the executions would be a cloud upon her title. The prayer is for injunction and general relief.

Reid and Apple & Co., in their answer, admit the rendition of the judgments, and the levy of the executions on the land described in the bill. They deny that the land is the property of Louisa Ganong, and charge that L. M. Ganong, the husband of complainant, bought the land with his own means, and procured the conveyance to be made to his wife for the purpose of defrauding creditors.

The answer is made a cross-bill, and prays that in their answer to said cross-bill the complainants be required to state distinctly whose money was used in the purchase of the land; to whom and by whom the money was paid; and to give a full history of the transaction. That L. M. Ganong state whether or not he told H. P. Reid, or others, after the deed was made, that he paid his own money for the land; and whether in paying for the land, he did not give the vendor a $500 check, which he had received from one Malone in payment for property of his own sold to Malone; also, whether he did not pay a large portion of the purchase money in merchandise out of a dry goods and grocery store, kept at the time by him in his own name.

The judgment creditors ask that the land be decreed to be subject to their debts, and sold under the executions by order of the court, or otherwise by the proper order or decree, and for general relief.

Complainants, in their joint answer to the cross-bill, state substantially as follows: On the 28th of February, 1868, L. M. Ganong was declared a bankrupt by the U. S. district court for the southern district of Mississippi.

He submits that his proceedings in bankruptcy suspended all suits and legal process against him; and that the judgments are void.

They insist that the purchase was made solely with

the means of the wife. L. M. Ganong submits that he is entitled to an exemption of 240 acres, and that only 80 acres of this tract is subject to execution in\ any event.

The respondents also state that at the time of their marriage, Mrs. Ganong owned $500 or $600; that this was kept separate and apart, as her own money. During the war Mrs. Ganong owned a sewing machine and made money by sewing for soldiers and others. She converted these earnings into gold. In 1865, she received from her mother several bales of cotton, which sold for $1,250 in currency. These sums amounted to about $3,200 in gold.

Having no house, she wished to purchase a piece of land as a home for herself and children. She gave this sum of money to her husband for the purpose. No suitable land was then offered for sale.

M. L. Ganong requested her to permit him to use this gold in purchasing a stock of goods. When an opportunity presented itself for the purchase of land, M. L. Ganong was to repay the amount to Mrs. Ganong. About $3,000 in gold was sold by M. L. Ganong and invested by him in a stock of goods, in the year 1865.

On the 28th of January, 1867, Richardson offered the land for sale, and she then requested her husband to purchase the land. The difference between gold and greenbacks would make about the sum of $4,500, the amount of purchase money.

The $500 draft was used in part payment. The draft was given by Malone for a tract of land purchased from M. L. Ganong a short time before. The land sold to Malone was purchased by M. L. Ganong with money belonging to Mrs. Ganong, M. L. Ganong taking the title in his own name.

Mrs. Ganong insists that her husband held this latter tract of land in trust for her.

She admits that Richardson was in part paid with

goods from the store of Mr. Ganong. Richardson had bought goods from Ganong, and the debt for the goods was taken as cash in payment for the land.

It is denied that Ganong ever stated to Reid, or any other person, that he purchased the land with his own means·

Mrs. Jane Wamble, in her deposition, taken by the defendants, states that she is the mother of L. J. Ganong.

Prior to her marriage, L. J. Ganong owned some household furniture and about $400 in money; perhaps more. She was never entitled to any devise or legacy, except from her father's estate.

She never received anything except from deponent. Deponent does not remember what sums she ever gave her.

In 1865, deponent gave her five bales of cotton, weighing about 500 pounds each. It was delivered in Memphis.

It was admitted that M. L. Ganong was adjudicated a bankrupt on the 28th of February, 1868, and that in 1869 a homestead was set apart to him not embraced in the land in controversy.

Final decree for complainants, making the injunctions final; and an appeal by the appellants allowed by order of court.

*H. H. Chalmers*, for appellants.

Admitting the statements of Ganong and wife to be true, still the decree is erroneous in perpetuating the injunction as to all the land; because by the statements of complainants themselves a very considerable portion of the $4,500 paid for the land arose out of the separate earnings of the wife with her sewing machine. (!) She claims to have had at the time of marriage $600; received from proceeds of cotton ginned by her mother $1,250—making a total of $1,850. Deducting this

amount from $4,500, we have $2,650 as her separate earnings, less the premium on gold. About $2,500 of the purchase price, then, arose out of the earnings of the wife during coverture. This, it is insisted, belonged to the husband and was liable for the payment of his debts. That this was so under the law of 1839 and 1846, and prior to the adoption of the code of 1857, see Henderson & Moore v. Womack, 27 Miss. 831; Armstrong v. Armstrong, 32 ib. 279 ; 30 ib. 19 ; ib. 589. The law was not materially changed by the code of 1857. See p. 335, art. 23.

It is contended for the wife that her earnings belong to her under this act, because they " accrue to her," not in any of the methods enumerated, but " otherwise," and that the word " otherwise " is intended to cover earnings. This theory is untenable, because,

1st. The word "otherwise " is only intended to cover the same generic methods of acquisition as are enumerated in the section.

" Descents, distributions, deeds of conveyance and recovery," all import something coming to the wife from some one else. Gifts of personal property are not enumerated, and they would be included in the word otherwise, because of the same generic signification; but the earnings of the wife are things which arise out of herself, and are the result of her personal labor. They do not stand upon the same footing as property derived in any of the modes specified.

2nd. Earnings do not " accrue" to her at all, but to her husband. The wife is subject to the husband in all things. Save in the matter of personal chastisement, she is as much under his control as the minor child. He fixes her abode and changes it at pleasure, and when she refuses to accept the place of residence which he selects, he has the right to divorce her. Fulton v. Fulton, 36 Miss. 518.

He controls her movements and her occupations,

provided only they be restrictions deemed reasonable in the law. He prescribes what companions shall or shall not visit at the home which he has selected for her. Fulton v. Fulton, *supra.*

These prerogatives negative the idea that she can engage in any business to be carried on by her personal labor, wholly independent of him, and in which he has no interest. Our lawgivers never intended to confer upon the wife the right to embark her personal services in speculations or trades with which the husband was wholly disconnected. To do so would be to authorize the wife at her own option to keep a hotel, or run a steamboat, or go on a whaling voyage without any limitation or control by her husband, and would virtually break up the married relation. We would soon perhaps have the spectacle of husband and wife carrying on antagonistic and rival pursuits, and trading, and cheating and swindling each other. Into all these trades she perhaps may embark her property, but not her person free from the husband.

The object of the law is wholly different from this. It simply is to secure to the woman her property, not her emancipation from the control of her husband. Whenever you declare that all that a woman can make belongs to her, you absolve her from every obligation to " obey " the husband.

All these married women's laws are of course in derogation of the common-law rights of the husband. To show how strictly they must be construed, we refer to cases of Dalton v. Murphy, 30 Miss. 59 ; Robertson v. Bruner, 24 ib. 343; Selph v. Howland, 23 ib. 264. That the earnings of the wife do not belong to her, under the code of 1857, is further shown from the fact that, in the new code of 1871, they are expressly given to her by the insertion of the words, " including the fruits of her personal services."

If the earnings were already included by the provi-

sions of the code of 1857, the insertion of these words in code of 1871 were unnecessary.    Code of 1871, § 1778, p. 376.

*Frank Johnston*, on the same side,

Insisted on behalf of the appellants that the earnings of the wife, under this statute, belonged to the husband. This statute being in derogation of the common law rights of the husband, must be strictly construed.    1 Kent Com. 464; 38 Miss. 118; Dwarris on Statutes, 750; Hopkins v. Landridge, 31 Miss. 678.

In the case last cited it was held that the proper rule of construction is to confine the statute to "the most narrow limits of the language employed."

It is admitted that the earning of the wife are not expressly named in the statute, but it is insisted that earnings belong to her under the words " or otherwise."

In Sharp v. Maxwell et al. 30 Miss. 591, and also in Lowry v. Craig, ib. 19, the court held, under the acts of 1839 and 1846, that the wife was only entitled to the property expressly enumerated.

The act of 1839 enumerates certain property that should belong to the wife, and provides the modes by which slaves could be acquired, as by " gift, conveyance, inheritance, distribution or otherwise."

In Henderson & Moore v. Warmack, 27 Miss. 835, (a case where a slave had been purchased with a wife's earnings,) the court held, upon construction of that statute, that the earnings of the wife belonged to the husband.

The act of 1839 is as broad as art. 23, code 1857, so far as the question of the wife's earnings is concerned, and the same rule of construction applies to the latter statute.

Upon a review of the laws of 1839 and 1846, art 23, code of 1857, and § 1778, code of 1871, it is clear that the earnings of the wife belonged to the husband until

the code of 1871, when, by § 1778, they were, in express terms, given to the wife.

It is insisted, therefore, that the land is subject to the debts of the husband, at least to an extent equal to the amount of the wife's earnings invested.

*W. & J. R. Yerger,* for appellees,
Argued the case orally, citing 38 Miss. 351.

SIMRALL, J.:

The chancellor came to the conclusion upon the testimony that the conveyance of the lands in controversy to Mrs. Ganong, was *bona fide,* and not in fraud of the creditors of the husband. In those cases where the decision of the chancery court turns upon controverted facts, the tenor of the decisions in this court is, that his judgment is analogous to the verdict of the jury, and his decision must be shown to be erroneous, by being opposed to the weight or preponderance of the testimony. If, however, there be no conflict in the testimony, and no dispute as to the facts in evidence, the decree may be right or wrong, as there has or has not been a proper application of legal principles to them. We can only deduce from the decree complained of, the views of the equity judge upon the law of the case. He does not generally announce the conclusions of law, as does the common law judge in his charges to the jury.

The creditors contend that the money which paid for the land, belonged to the husband, or was derived from his means, and therefore, the employment of his money in the purchase, was such a disposition of his effects, as concealed, or attempted to conceal them from creditors in fraud of their rights.

The proposition to be decided is one of fact. Did the separate money or property of the wife, pay for the

land? In Garrison v. Fisher, 26 Miss. 352, the property sought to be subjected to the husband's debt, was paid for by the wife by means of a parcel of land which she owned. The wife claims that of her means that were used in the purchase were, $600, money which she had at her marriage; $1,250, proceeds of cotton given to her by her mother, and about $2,500, earnings, from personal labor, by sewing. The aggregate price of the land was $4,500.

In Henderson &·Moore v. Warmack et al. 27 Miss. 834, (in 1854), it is said that the earnings of the wife, at common law, were the absolute property of her husband, and the investment of them in property in her own name, was in law an investment of the husband's means, and the title would be in him. The act of 1839 did not abridge the marital rights of the husband except, as far as were accomplished by the terms of the statute. Sharp v. Maxwell et al. 30 Miss. 591, (in 1856.) In Lowry and wife v. Craig, executor, 30 Miss. 19, it was held that the acts of 1839 and 1846 only extended to the property enumerated in them, therefore they did not include the widow's right to exempt property which was a chose in action; but upon her marriage it vested in the husband, under the common law. The property, real and personal, enumerated in the acts of 1839 and 1846, are real estate and slaves. By the 5th section of the latter statute, if she "owned a plantation and slaves," she could also hold and own separately "such stock for farming utensils and implements of husbandry, as may be necessary for the business of planting. The marital rights of the husband did not take hold of this property, but as to all other, it vested in him by marriage as at common law. The language of the 23rd section of statute of 1857, is broader than the 1st section of the statute of 1839 in these particulars. "Every species and description of property, whether real or personal, and all money, rights. and credits," is the description of

property in the former.   In the latter, 1st section, wife may become seized or possessed of any property real or personal."   The 2nd section specifically embraces "slaves."   The mode of acquisition in the former is "by will, descent, distribution, deed of conveyance, recovery, or otherwise."   The 3rd section of the latter is as follows: "When a woman during coverture shall become entitled to, or possessed of slaves by gift, conveyance, inheritance, distribution, or otherwise"  *  *  *. Looking to the three statutes of 1839, 1846 and 1857, we find that the object of the act of 1846 was to protect to the wife the income of the property which, under the statute of 1839, she would hold as a "separate estate," and making an addition thereto of "farming implements and stock" if she had a plantation and slaves. The statute of 1837, added to such property as she might own separately, every species of property, land, movables, money, credits and rights," etc.

It will be observed that the third section of the act of 1839, descriptive of the modes by which "slaves" may be acquired during coverture, are as broad as those in the twenty-third article of the statute of 1857.   In both sections, at the close of the specific enumeration, are the general words, "or otherwise"—as if the legislature had said, if there is any other way by which she can become owner, not embraced in the enumeration, by gift, conveyance,  *  *  *  etc., that way shall be covered by these words.   It is claimed that the statute of 1857 is broader than the act of 1839 and 1846, and that the earnings of the wife, invested in property, is an acquisition of property by means acquired "otherwise than in the specified modes.

But is not this view of the subject concluded by the case cited from 27 Miss. 834?   That case arose under the statutes of 1839 and 1846.   The earnings of the wife had been used in buying a "slave" in her own name.   The controversy was there, as here, between her

and a creditor or purchaser of the husband. As we have seen, the third section of the act of 1839 secures to a woman "slaves" which came to her during coverture, by "conveyance, gift, inheritance, distribution or otherwise." It was argued, therefore, that an investment of the wife's earnings, if not covered by the specific terms, was embraced in the general words. Our understanding of the judgment of the court is that the property must come to the wife, by means other than those derived from the husband; and that her earnings are his. This third section is just as broad to uphold the argument made for the wife, as is the twenty-third article of the statute of 1857 (code); and if proper to disallow it under the one, so it must be under the other. The twenty-fourth art. (code, 336), enables the wife to purchase property with what money she had at her marriage, or which accrued to her afterwards from the income of her property, or otherwise. No matter from what source the money comes, she may so employ it, provided it is her money. If it be the gift of a stranger, it is hers. If it is derived from the husband, it is hers, also, as against him, but not his creditors.

That the personal earnings of the wife are not relieved by these laws, from the marital rights of the husband, is evidenced by the fact, that the codifiers and the legislature of 1871 thought it proper to place them upon the same footing as income from the wife's property. We are of opinion, therefore, that the husband has an interest in the lands in controversy in the proportion that the wife's personal gains bears to the amount of money which she had at the time of her marriage, and the proceeds of her cotton, or other separate means compared with the aggregate cost of the land. These personal gains from her own labor, compared with the whole cost of the land, is the extent of interest of the husband which the creditors may have applied to their debt.

The dealings between the husband and wife, in reference to the use of her money in the business of merchandise, and its subsequent repayment, in the form of a part payment for the land, if the transaction was *bona fide*, is indicated by the principles of the case of Mangum v. Finucane, 38 Miss. 354.

Decree reversed and cause remanded for further proceedings, in accordance with this opinion.